## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| PS AMERICA, INC., | § | |
| | § | Case No. 09-37209 (MI) |
| Debtor. | § | |

## DECLARATION OF JAMES W. TRAWEEK
## IN SUPPORT OF THE DEBTOR'S CHAPTER 11
## PETITION AND REQUESTS FOR FIRST DAY RELIEF

JAMES W. TRAWEEK hereby declares, under penalty of perjury, as follows:

1.     I am the Chief Executive Officer of PS America, Inc. (the "Debtor") and set forth the following in support of the Debtor's chapter 11 petition, and requests for relief filed contemporaneously herewith.

## I.
## INTRODUCTION

2.     On the date hereof (the "Petition Date"), the Debtor commenced its chapter 11 case (the "Case") by filing a voluntary petition for relief under title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

3.     To minimize the adverse effects on its business as a result of the commencement of the Case, the Debtor requests various types of relief in certain "first day" applications and motions (collectively, the "First Day Motions").  In the First Day Motions, the Debtor seeks, among other things, to:   (a) establish procedures for the efficient administration of this Case, (b) continue the Debtor's operations while in chapter 11 with as little disruption as possible; (c) maintain the confidence and support of key constituencies and

employees; (d) obtain debtor in possession financing upon consent of the lenders; and (e) retain appropriate professionals. Gaining and maintaining the support of the Debtor's key constituencies, including employees, customers and vendors, as well as maintaining the day-to-day operations of the Debtor's business with minimal disruption and erosion, will be crucial to the success of the Debtor's efforts in chapter 11 on behalf of its creditors.

4.     In addition to the personal knowledge that I have acquired while acting as CEO of the Debtor, I also have knowledge of, and familiarity with, the Debtor's books and records, and financial and operational affairs. I have also participated directly in communications and negotiations with the Debtor's secured lenders, vendors, customers, and others, and worked closely with the Debtor's personnel who handle business operations and financial management, as well as with the Debtor's outside counsel and other advisors. Except as otherwise indicated, all statements in this declaration (the "Traweek Affidavit") are based upon my personal knowledge, my review of the Debtor's books and records, and other relevant documents, and other information prepared or collected by the Debtor's employees, or upon my opinion based upon my experience with the Debtor's operations and financial condition. In making the statements herein, based upon the foregoing, I have relied in part upon others to accurately record, prepare, and collect any such documentation and other information.

5.     If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge and review of documents, or upon my professional opinion.

6.     I submit the Traweek Affidavit in support of the Debtor's petition and First Day Motions. As CEO, I am authorized to submit Traweek Affidavit on behalf of the Debtor.

## II.
## BACKGROUND

**A.**     **Overview of the Debtor**

7.     PS America, Inc. is a Pennsylvania corporation headquartered in Longwood, Florida.  The Debtor operates approximately 36 retail stores in 15 states under the name ProSource, including five (5) stores in and around Houston, Texas.  ProSource is an exclusive and member-only floor covering resource.  Each ProSource showroom, except for three franchisor-owed stores, is independently owned and operated.

8.     The Debtor was developed in response to the needs of a special niche in the floor covering industry – the trade professional.  The Debtor's franchisor opened its first ProSource showroom in 1990 in St. Louis, Missouri. The ProSource showroom quickly became the ideal solution to meet the unique requirements of builders, remodelers, interior designers, contractors, rehabbers, real estate professionals, installers, architects and other flooring trade professionals to see wholesale or discount carpet, laminate floors, area rugs, tiles amount other flooring options. In 1994, the Debtor opened showrooms in new markets across the United States, including six (6) stores in Texas, helping to create immense buying power that in turn, enables the Debtor to pass the savings back to its members.

9.     The Debtor works between flooring manufacturers and distributors to the trade professions who need to buy flooring options or showcase them to their clients.  The Debtor's showrooms exhibit hardwood, laminate, carpet, ceramic and porcelain tile, cushion and

underlayment and installation supplies and samples of more than 25,000 flooring options from more than 200 carpet, tile and flooring manufacturers.

10.    The Debtor's showrooms feature brand names such as Anderson, Wilsonart, Mohawk, Shaw, Masland, Stainmaster, Tuftex, Bruce, Mannington, Armstrong, Columbia, Daltile, Amtico, Teragren, and more.   The Debtor also offers unique exclusive brands to increase the customer's available selection, including: Biltmore, DuraPoint, DuraWeave, Harding,  Meritage, Resista, Somerset House, Maretti and Sof-Loc Cushion.

**B.     Financing History**

11.    The following is presented upon information and belief, and upon reliance on others familiar with the Debtor's books and records, financial operations, affairs and history.

12.    On or about September 16, 2005, the Debtor and FirstMerit Bank, N.A. (the "Prepetition Lender") entered into that certain Business Loan Agreement, wherein the Debtor agreed to repay the Prepetition Lender the sum of $2,000,000, together with interest.  As a part of said loan transaction, the Debtor executed a Promissory Note (the "Note"), a Commercial Security Agreement (the "Security Agreement") and other related documents (collectively, the "Initial Loan Documents").

13.    Subsequently, on January 10, 2007, the Debtor and the Prepetition Lender entered into that a Modification of Loan Documents wherein the Prepetition Lender and the Debtor agreed to increase the loan commitment under the Initial Loan Documents from $2,000,000 to $4,000,000.  Additionally, the Prepetition Lender and the Debtor entered into another Business Loan Agreement wherein the Debtor borrowed and agreed to repay the Prepetition Lender the sum of $2,500,000 (together with the Modification of Loan Documents, the "Subsequent Loan Documents").   In connection with the Initial Loan

Documents and the Subsequent Loan Documents, the Debtor granted the Prepetition Lender a security interest in: (i) all inventory; (ii) chattel paper; (iii) accounts; (iv) equipment; and (v) general intangibles.  As of the Petition Date, the outstanding indebtedness owed to the Prepetition Lender totals $4,945,966.

**C.      Challenges Facing the Debtor and Need for a Chapter 11 Filing**

14.     Over the past year, the Debtor has faced a series of challenges for its business. The Debtor is one of the largest wholesale flooring providers in North America and the largest ProSource franchise.  All of its customers are involved in either home building or remodeling. In the past thirty six months, the Debtor's customers have been drastically and adversely affected by the housing market decline.  Many markets have seen new housing starts decrease by over 30% and, in some markets, by 50%.  The Debtor has also been affected by the housing market collapse.  Annual sales revenue has decreased by over $33,000,000 in the past thirty six months, severely impacting the Debtor's profitability.

15.     As a result of these challenges, the Debtor undertook an evaluation of potential restructuring options with its existing lenders or a sale of its assets.  However, through the process of developing a business plan to support such a restructuring or sale, the Debtor determined that the instant chapter 11 filing was the best way to maximize value for all constituents.

16.     Thus, the Debtor contemplated a chapter 11 filing.  Chapter 11 would provide the Debtor a breathing spell to pursue opportunities to effectuate a sale process or

reorganization that would maximize the value of the Debtor's assets for its constituencies. Absent chapter 11, further erosion of the Debtor's business and relationships was certain.

17.     To effectuate the strategies set forth herein and maximize values for all creditors, including unsecured creditors, the Debtor was forced to commence this chapter 11 Case now and respectfully seek the relief set forth in the First Day Motions summarized below.

### III.
### FIRST DAY MOTIONS

18.     Concurrently with the filing of this chapter 11 Case, the Debtor will be filing a number of First Day Motions.[1] The Debtor anticipates that the Court will conduct a hearing within two (2) business days or less of the commencement of the Case (the "First Day Hearing"), during which the Court will entertain the arguments of counsel with respect to the relief sought in the First Day Motions.

19.     Generally, the First Day Motions have been designed to meet the immediate goals of: (a) establishing procedures for the efficient administration of the Case, (b) continuing the Debtor's operations during this Case with as little disruption and loss of productivity as possible, and (c) maintaining the confidence and support of vendors, customers, employees and other key constituencies.

20.     I have reviewed each of the First Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the First Day Motions is narrowly tailored to

---

[1]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve success in the chapter 11 Case.

21.     The First Day Motions are identified, listed and more fully described below.

**A.**     ***Administrative Motions***

**Emergency Motion for (I) Approval of the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Case and Other Information; and (II) Authority to Establish the Master Service List Applicable to this Case**

22.     Several thousand creditors and parties in interest may be entitled to receive notice in this Case.  As such, notice of all documents filed in this Case to each creditor and party in interest would be extremely burdensome and costly to the estate. The Debtor, therefore, has proposed to establish procedures to govern notice to parties in this Case that will conserve substantial resources and limit unnecessary service of documents.

**Request for Emergency Consideration of Certain "First Day" Matters**

23.     Emergency consideration of the First Day Motions is necessary so that the Debtor may continue to operate in the ordinary course of business during the pendency of this Case. Without immediate consideration, the Debtor will not have the authority to use cash collateral, pay its normal operating expenses, or undertake virtually any of the day-to-day tasks necessary for its business to operate.

**Emergency Motion for Extension of Time to File Schedules and Statement of Financial Affairs**

24.     Due to the size and complexity of the Debtor's operations, and its prepetition focus on preparing its chapter 11 filing, the Debtor has been unable to complete the drafting of Schedules and does not anticipate having the Schedules ready for filing within the fifteen (15) day period prescribed by Bankruptcy Rule 1007(c).

25.     However, the Debtor anticipates that it will take no more than thirty (30) days to complete, review, and file the Schedules with the Court.  Thus the Debtor requests that the Court extend the fifteen (15) day period under Bankruptcy Rule 1007(c) for an additional fifteen (15) days.

**B.     _Operational Motions_**

**Emergency Motion of the Debtor for Entry of an order Authorizing (A) Continued Use of (I) Existing Bank Accounts, (II) Business Forms and (III) Cash Management System and (B) Waiver of Investment Guidelines**

26.     The Debtor's cash management system is comprised of two (2) types of bank accounts in the name of PS America, Inc.: (i) local showroom depository accounts (the "Depository Accounts") and (ii) a single central corporate account (the "Corporate Account"). The Depository Accounts and the Corporate Account are collectively hereinafter referred to as the "Bank Accounts."  The Bank Accounts are part of a carefully constructed and highly automated cash management system that ensures the Debtor's ability to efficiently monitor and control all cash, as more fully described below.

27.     By the Motion, the Debtor seeks an order: (a) authorizing the continued use of the Debtor's existing bank accounts and continued use of existing business forms and checks, (b) continued use of the existing cash management system, (c) waiving investment and deposit guidelines of section 345 of the Bankruptcy Code and the United States Trustee's Guidelines, and (d) providing any additional relief required in order to effectuate the principal relief sought in the Motion.  The relief requested will help ensure the Debtor's smooth transition into chapter 11 and avoid the possible disruptions and distractions that could otherwise divert the Debtor's attention from more pressing matters during the initial days of this Case.

**Emergency Motion of the Debtor for Order (A) Authorizing, but not Directing, Debtor to Pay Certain Pre-Petition Wages, Compensation and Employee Benefits in the Ordinary Course of Business; and (B) Authorizing and Directing Applicable Banks and Other Financial Institutions to Process and Pay All Checks Presented for Payment and to Honor All Funds Transfer Requests Made by the Debtor Relating to the Foregoing**

28.     The Debtor's employees each fall in to one of the following employment categories - "Regular Full-Time," "Part-Time," "Introductory" and "Temporary" (collectively, the "Employees").  A more detailed description of the categories of Employees is as follows:

(a)     Regular Full-Time Employees are those who are not in a Temporary or Introductory status and who are regularly scheduled to work the Debtor's full-time schedule. Generally, they are eligible for the Debtor's benefit package, subject to the terms, conditions, and limitations of each benefit program.

(b)     Part-Time Employees are those who are not assigned to a Temporary or Introductory status and who are regularly scheduled to work twenty-five (25) hours or less per week.  While they do receive all legally mandated benefits (such as Social Security and workers' compensation insurance), they are ineligible for the Debtor's other benefit programs.

(c)     Introductory Employees are those whose performance is being evaluated to determine whether further employment in a specific position or with the Debtor is appropriate.  Introductory Employees who satisfactorily complete the introductory period are notified of their new employment classification.  The introductory period applies to all Employees and lasts for a period of sixty (60) days from the date of employment.

(d)     Temporary Employees are those Employees who are hired as interim replacements, to temporarily supplement the work force, or to assist in the completion of a

specific project. Employment assignments in this category are of a limited duration. Temporary Employees retain this status unless and until notified of a change. While Temporary Employees receive all legally mandated benefits (such as workers' compensation insurance and Social Security), they are ineligible for all of the Debtor's other benefit programs.

29.     As of the Petition Date, the Debtor's aggregate workforce consisted of approximately 277 Employees. The Employees have been paid current through September 30, 2009.

30.     The Debtor utilizes Automatic Data Processing, Inc. ("ADP") to process payroll for its Employees. Bi-weekly, ADP initiates an electronic funds transfer to satisfy payroll obligations. In the ordinary course of its business, the Debtor, through ADP, distributes bi-weekly payroll (every other Friday) for Employees to pay accrued and unpaid wages for all work performed through the end of the previous payroll period. The Debtor's gross payroll obligations are approximately $221,790 a week, including payroll taxes, for Employees.

31.     The Debtor estimates that, as of October 2, 2009, the Debtor's non-commissioned employees will have been paid current through September 30, 2009, with the exception of John Merit and myself. Additionally, as of October 2, 2009, commissioned employees will have been paid their base rate through September 30, 2009. The Debtor estimates that as of the Petition Date, accrued unpaid wages or salaries (the "Wages or Salaries") of the Employees may be as high as approximately $82,000 (for and including unpaid bonuses and commissions) excluding payroll taxes) in the aggregate, or on average

approximately $307 per Employee.  This amount of Wages or Salaries includes an estimate for uncashed checks and accrued but unpaid payroll.

32.     Further, in the ordinary course of business, the Debtor also utilizes the services of a temporary employment agency firm (the "Temporary Agency") for interim replacements, to temporarily supplement the work force, or to assist in the completion of a specific project (the "Temporary Employees").  Because the services provided by the Temporary Employees are necessary for the Debtor's operations, the Debtor requests authority to pay accrued and unpaid pre-petition obligations to the Temporary Agency.  As of the Petition Date, the Debtor has in $18,051.86 in accrued and unpaid pre-petition obligations.

33.     To enable the Debtor to retain its current Employees during this critical time, minimize the personal hardship such Employees may suffer if pre-petition employee-related obligations are not paid when due, or honored as expected, and maintain morale, the Debtor, by the Motion, seeks authority, in its discretion, to pay and/or honor, as the case may be, (a) certain pre-petition claims of Employees, including, but not limited to, claims for wages, salaries, vacation, sick leave, other benefits, and unpaid reimbursable expenses and certain costs and disbursements related to the foregoing, up to the statutory cap of $10,950 per Employee, and (b) all pre-petition federal and state withholding obligations.  The Debtor further requests that the Court enter an order directing all banks to honor the Debtor's pre-petition checks or electronic transfers for payment of the foregoing, and prohibiting banks from placing any holds on, or attempting to reverse, any automatic transfers on account of the foregoing.

34.     The Employees are essential to the continued operation of the Debtor's business and the Employees' morale directly affects their effectiveness and productivity.

Consequently, it is critical that the Debtor continues, in the ordinary course, those personnel policies, programs, and procedures that were in effect prior to the Petition Date.  If the checks issued and electronic fund transfers requested in payment of any of the compensation or other Employee obligations are dishonored, or if such obligations are not timely paid post-petition, the Employees may likely suffer extreme personal hardship and may be unable to pay their daily living expenses.  A loss of employee morale and goodwill at this crucial juncture would undermine the Debtor's stability, and undoubtedly would have a negative effect on the Debtor, its customers, the value of its assets and business, and their ability to achieve its objectives in chapter 11.

> **Emergency Motion of the Debtor for Entry of an Order (I) Authorizing the Debtor to Pay Prepetition Sales and Use, Franchise and Similar Taxes and Regulatory Fees in the Ordinary Course of Business and (II) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto**

35.    In connection with the normal operation of its business, the Debtor pays an assortment of sales and use, business and occupation, gross receipts, business privilege and similar taxes (the "Taxes") to various federal, state, and local taxing authorities (collectively, the "Taxing Authorities") and pay various customs import duties and regulatory fees ("Regulatory Fees") to federal, state, and local regulatory authorities (collectively, the "Regulatory Authorities," and together with the Taxing Authorities, the "Taxing and Regulatory Authorities").  These taxes and fees include, without limitation, sales taxes, franchise taxes, and regulatory fees.

36.    By this Motion, the Debtor seeks, pursuant to Sections 105(a), 363, and 507(a) of the Bankruptcy Code, authority to pay, in the Debtor's sole discretion, pre-petition Taxes and Regulatory Fees owed to the Taxing and Regulatory Authorities, including, without

limitation, Taxes and Regulatory Fees subsequently determined to be owed for periods prior to the Petition Date, in an aggregate amount (excluding amounts paid pre-petition by checks that have not yet cleared on the Petition Date) not to exceed $370,801.00 which is the appropriate, aggregate maximum sum that the Debtor currently believes will be due on account of pre-petition Taxes and Regulatory Fees.

37.     To the extent that any check issued or electronic transfer initiated prior to the Petition Date to satisfy any pre-petition obligation on account of Taxes or Regulatory Fees has not cleared the banks as of the Petition Date, the Debtor requests the Court to authorize the banks, when requested by the Debtor in its sole discretion, to receive, process, honor, and pay such checks or electronic transfers, provided that there are sufficient funds available in the applicable accounts to make such payments.  The Debtor also seeks authorization to issue replacement checks, or to provide for other means of payment to the Taxing and Regulatory Authorities, to the extent necessary to pay such outstanding Taxes and Regulatory Fees owing for periods prior to the Petition Date.[2]

38.     For the reasons described in the Motion, among other things, the payment of pre-petition Taxes and Regulatory Fees will help the Debtor avoid serious disruption to its operations and efforts in this chapter 11 Case that would result from the failure to pay such taxes and fees, including the distraction and adverse affect on morale that could result from liability for nonpayment imposed upon the Debtor's directors and officers.  Furthermore, nonpayment of these obligations may cause Taxing Authorities to take precipitous action,

---

[2]   Because each of the checks or electronic transfers is readily identified as relating directly to an authorized payment of pre-petition Sales Taxes and Regulatory Fees, the Debtor believes that checks and electronic transfers for payments that are not authorized will not be honored inadvertently.

including, but not limited to, filing liens, preventing the Debtor from conducting business in applicable jurisdictions, and seeking to lift the automatic stay, all of which could disrupt the Debtor's day-to-day operations, impose significant costs on the Debtor's estate, and destroy the going-concern value of the Debtor's business.

### Emergency Motion of Debtor for Entry of an Order Authorizing the Payment of Prepetition Claims of Shippers

39.     The Debtor's supply and delivery system depends upon the use of reputable common carriers, shippers, couriers, and truckers (collectively, the "<u>Shippers</u>").  Specifically, the Debtor's ability to obtain goods for its retail stores depends on the frequent delivery of goods needed for these stores from the Debtor's vendors.  The Debtor employs approximately thirty (30) Shippers to ensure that its delivery network runs smoothly.

40.     The Debtor engages the Shippers to transport and goods and other materials from the Debtor's vendors to the Debtor's retail stores for sale to the Debtor's customers.  As a result, in the ordinary course of the Debtor's business, these Shippers have possession of the Debtor's goods and other materials that are *en route* from a vendor to one of the Debtor's retail stores.  The Debtor expects that, as of the Petition Date, certain of the Shippers will have outstanding invoices for goods and other materials that were delivered to, or were in the process of being delivered to, the Debtor's retail stores prior to the Petition Date (collectively, the "<u>Shipping Claims</u>").  Although the Debtor has generally made timely payments to the Shippers, as of the Petition Date, the Debtor estimates that the amount that may be outstanding to the Shippers is approximately $17,000.00.

41.     The Debtor's request to pay the prepetition claims of the Shippers is necessary and appropriate here because the failure to satisfy the Shipping Claims could have a material

14

adverse effect on the Debtor's day-to-day business operations and relationships with its customers and vendors.  The total amount to be paid to the Shippers on account of their prepetition claims is minimal compared to the importance and necessity of the Shippers to the Debtor's business operations and the direct and indirect losses that the Debtor would suffer as a consequence of a Shipper's refusal to either (as applicable) deliver goods or other materials to the Debtor or its customers.  Moreover, the Debtor does not believe that there are viable and timely alternatives to the Shippers that the Debtor has used prior to the Petition Date.

42.    It is essential for the Debtor's business operations that the Debtor maintains a reliable and efficient supply and distribution network.  Because the Debtor is dependent on third parties for the delivery goods from its vendors, it is essential that the Debtor's bankruptcy Case not be a reason or excuse for any such party to cease timely performing delivery or related services or to retain goods in their possession on account of unpaid prepetition claims.  If the Debtor is unable to receive deliveries on a timely and uninterrupted basis, the Debtor's retail operations would be seriously impeded with devastating consequences.  In turn, the Debtor will likely suffer, at a minimum, a significant loss of credibility and customer goodwill as well as revenue, thereby causing substantial harm to its business and reorganization efforts.

**Emergency Motion of the Debtor for Entry of an Order Authorizing the Debtor to Honor Certain Pre-Petition Obligations to Customers and to Otherwise Continue Certain Customer Practices and Programs in the Ordinary Course of Business**

43.    The Debtor's members (the "Members") include building and trade professionals, who pay an annual fee of $50 to have exclusive access to the Debtor's showrooms and products.  Membership grants Members access to the Debtor's showrooms

during normal operating hours.   For an additional $100 per year, a Member receives a proximity key/card, which allows the Member 24 hour access to Debtor's showroom.   A lifetime membership can be purchased for $500.   Although the Debtor, may at times sell directly to the general public, the Members are the Debtor's customer base.

44.     The success and viability of the Debtor's business, and ultimately the Debtor's ability to successfully maximize value for the stakeholders in this case, are largely dependent upon the patronage and loyalty of its Members.   In this regard, the Customer Satisfaction Programs, as detailed more fully in the Motion, are critical, and any delay in honoring the Debtor's obligations there under will severely and irreparably impair Member relations.   Any failure to honor prepetition Customer Satisfaction Programs may well drive away valuable Members, thereby harming the Debtor's efforts to maximize the value of the estate for creditors.

45.     Upon the filing of this case, certain obligations that arose under the Customer Satisfaction Programs would constitute general unsecured prepetition claims, although some such claims may at least arguably be subject to set-off rights.   In order to maintain some continuity and reliability of the Debtor's business and to avoid the necessity of creating an administrative mechanism to distinguish returns of merchandise purchased prepetition from merchandise purchased post-petition (to the extent such a distinction is possible), the Debtor seeks authority, in its sole discretion, to continue to honor the Customer Satisfaction Programs.   Customer relations would be severely damaged were the Debtor prohibited from doing so.

46.     Indeed, many of the Debtor's customers are likely evaluating whether the filing of this case should cause them to adjust their business relationships with the Debtor.

16

The Debtor desires to assuage any such fears by minimizing the effects of this case on its customers.  These efforts would be thwarted if the relief requested in this Motion were not granted.  For these reasons, permitting the Debtor to continue to honor the Customer Satisfaction Programs, is justified and essential to the Debtor's continued operations.

### Emergency Motion of the Debtor for Order Authorizing Rejection of Certain Unexpired Leases, *Nunc Pro Tunc* as of the Petition Date and Authorizing Abandonment of Certain Personal Property

47.    The Debtor, after consideration of its current and expected future business objectives, and in connection with its efforts to reduce costs, has determined that the Rejected Leases listed on Exhibit A attached to that Motion are burdensome and should be rejected. The Rejected Leases consist of non-residential real property leases for retail locations where the Debtor has ceased operations.  Consequently, the Debtor believes that there is little or no value to the Rejected Leases and thus, the Debtor's estate derives no benefit from maintaining the Rejected Leases.

48.    The Debtor submits that its decision to reject the Rejected Leases is supported by sound business judgment.  Indeed, the Debtor no longer has the need for the Rejected Leases.  Accordingly, the Debtor believes that the Rejected Leases are burdensome to its estate and that it is in the best interest of the estate to reject the Rejected Leases and reduce its administrative expenses.  Such agreements provide the Debtor and its estate with no financial benefit, and maintaining the Rejected Leases would increase the administrative burden to the estate.  Accordingly, the Debtor respectfully submits that rejection of the Rejected Leases reflects the Debtor's exercise of sound business judgment and is in the best interests of its estate and creditors.

49.     Finally, to the extent any furniture, fixtures, and equipment are to be left at the locations of the Rejected Leases (the "Personal Property"), the Debtor will use its sound business judgment to determine whether it is in the best interests of its bankruptcy estate to abandon the Personal Property.   The Debtor will only leave Personal Property that has no value to its estate and is not necessary to the Debtor's future business operations.

**Application of Debtor for Order Authorizing Retention and Employment of Greenberg Traurig, LLP as Counsel for the Debtor, *Nunc Pro Tunc* as of the Petition Date**

50.     The Debtor seeks to retain Greenberg Traurig because of the firm's extensive general experience and knowledge in the field of debtor and creditor rights and business reorganizations under chapter 11 of the Bankruptcy Code.   Moreover, Greenberg Traurig is well suited for the type of representation required by the Debtor.   Greenberg Traurig maintains an office for the practice of law in Houston, Texas, where this Case is pending and has extensive experience appearing before the courts in this district.   In addition, Greenberg Traurig has substantial experience representing debtors in reorganization cases.

51.     Accordingly, the Debtor determined that Greenberg Traurig has the resources and experience necessary to represent it in this Case.   Furthermore, Greenberg Traurig has become intimately familiar with the Debtor's business and operations and many of the legal issues that may arise in the context of this case while acting as the Debtor's counsel.   Thus, the Debtor desires that Greenberg Traurig continue to represent it in connection with this Case.  The Debtor believes that Greenberg Traurig's employment is in the best interest of the Debtor, its estate, and its creditors.

**Emergency Motion Of The Debtor For Order (A) Authorizing The Debtor (I) To Obtain Postpetition Financing Pursuant To Sections 363 And 364 Of Title 11 Of The United States Code; (II) To Grant Liens And Superpriority Claims; And (Iii)**

18

**To Obtain Emergency Postpetition Financing Pending Final Hearing And (B) Scheduling Final Hearing**

52.　　The Debtor requests authorization to obtain postpetition secured financing in an aggregate amount at any one time outstanding of up to $2,200,000 on an interim basis, and up to Two Million Six Hundred Dollars ($2,600,000) on a final basis, in accordance with the terms and conditions set forth in the proposed term sheet (the "<u>Term Sheet</u>") among the Debtor and Phoenix Wholesale, LLC  the ("<u>Postpetition Lender</u>").

53.　　In order to prevent the harm that would result from an abrupt halt in the Debtor's operations, the Postpetition Lender has agreed to provide the Debtor with postpetition financing on the terms described in the Motion, and more particularly, in the Term Sheet.  The Postpetition Lender is willing to provide the postpetition financing to facilitate the sale and a structured liquidation in chapter 11.  While the Debtor did not shop postpetition financing or other financial accommodations from any alternative prospective lender, undertaking this financing is consistent with the Debtor's obligation to seek to maximize the value of its assets for the benefit of creditors.

54.　　The Debtor has exercised sound business judgment in determining that a postpetition credit facility is appropriate and has satisfied the legal prerequisites to enter into the financing pursuant to the Term Sheet.  The Term Sheet's terms are fair and reasonable and are in the best interests of the Debtor's estate.  The delays, cost and expense of placing this loan with a new lender, assuming one could be found, would be detrimental to the estates and ultimately diminish creditor recoveries.

55.　　The Debtor has an urgent and immediate need for cash to continue to operate. Currently, the Debtor does not have sufficient funds with which to operate the business on an

ongoing basis.  The availability of interim loans under the Term Sheet will provide necessary assurance to the Debtor's vendors, employees, and customers of the Debtor's ability to meet its near-term obligations. Failure to meet these obligations and to provide these assurances likely would have a significant negative impact on the value of the business, to the detriment of all parties-in-interest.

**IV.**
**<u>CONCLUSION</u>**

56.     The primary purpose of the filing of this chapter 11 Case is to prevent deterioration and to protect the going-concern value of the business operated by the Debtor while the Debtor evaluates potential sale transactions or works toward confirmation of a plan of reorganization.  In the interim, through the Motions and Applications described above, the Debtor seeks to minimize certain adverse affects that this Case might otherwise have on its business, while honoring the spirit of the chapter 11 process.

57.     To preserve the value of its business to the fullest extent possible, the Debtor's immediate objective is to maintain "business as usual" following the commencement of this Case by minimizing the adverse impact of the filing on the Debtor's assets and operations. For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if this Court grants the relief requested in each of the First Day Motions and respectfully request the Court to do so.

I declare, pursuant to 26 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge and belief.

Dated: September **30**, 2009

JAMES W. TRAWEEK
Chief Executive Officer, PS America, Inc.
Debtor and Debtor In Possession